Final case of the morning is No. 17-20027, Delaronde v. Legend Classic Homes. Delaronde v. Legend Classic Homes, Limited Final case of the morning is No. 17-20027, Delaronde v. Legend Classic Homes. Rachel Steele. Yes, Your Honor. Good morning. Good morning. My name is Rachel Steele. I represent the appellant in this case, Legend Classic Homes. Today, we will be looking at two different issues, one under Rule 50B, motion for judgment of whether or not there's legally sufficient evidence. And then alternatively, we're asking this court to grant a motion for a new trial based on harmful error or failure to include a submitted instruction. First, I'm going to focus on the two issues with regard to the Rule 50B, Your Honor. The first is whether the appellee, Ms. Delaronde, presented legally sufficient evidence that she would not have been transferred but for her gender. And next, did Ms. Delaronde provide legally sufficient evidence that her conditions were so miserable and intolerable that a reasonable person would have felt compelled to resign in amounting in a constructive discharge. I'm going to go over a little bit of the facts because this is a very fact-intensive case and then look at each of these different items with regard to gender discrimination and constructive discharge. Legend Classic Homes is a woman-owned builder of new homes in the Houston area. And Ms. Delaronde was employed as a sales counselor selling these new homes just north of town up near the Woodlands. When she first started working for the company, she was partnered with another sales associate or sales counselor by the name of Brett Briggs up in a division called Legends Trace. At that time, Mr. Briggs helped Ms. Delaronde or trained her in the new subdivision. Ms. Delaronde had sold new homes before for a competitor, but what she didn't know was the legend way, legend contracts, legend amenities, legend products, which types of houses sold better, which types of amenities sold better. So Mr. Briggs helped her with that. Mr. Briggs was then transferred to another community across town, and another sales associate, a woman by the name of Ms. Dorman, was brought in to be Ms. Delaronde's sales partner. Just as Mr. Briggs had done for Ms. Delaronde, Ms. Delaronde now helped out Ms. Dorman to learn different legend products. Legend had a policy of practice that when they hired a new, brought in a new sales counselor, the sales partner at that community would help that person along. You can call it training, managing, lending a helpful hand, whatever it is. Even a person with experience in selling homes for a competitor did not know legend products, legend pricing, and what sold better, and that's what Ms. Delaronde did with Ms. Dorman. They sold properties in that subdivision for a couple of years, and then ultimately, a subdivision nearby, 12 miles away, by the name of Deerbrook Estates, found itself without any sales counselors whatsoever. So legend decided to promote from within, basically, and take a sales assistant, a woman, and to promote her up to sales counselor so that she could learn to sell new homes. And they placed her into this subdivision, Deerbrook Estates. So you're claiming this was a promotion? No, Your Honor. With regard to Ms. LeQuinn, not with regard to the appellant. The appellant, in this case, this was a transfer. It was merely a transfer to help the woman who did receive a promotion because she had never sold homes at all for Legend Homes. That is why she was put into that community. When she was put into that community, then, the person that took her place at Legend's Trace was a man by the name of Marvin Bullard. Was that LeQuinn's place or Delaronde's place? Delaronde's place. And that's what I thought. I'm sorry to say, LeQuinn, I'm sorry, Your Honor. That's okay. So Ms. Delaronde was transferred 12 miles away to this new community, and she was there to help out, train, manage, whatever you want to call Ms. LeQuinn because she was new. Mr. Bullard was a new employee. He had just been hired a couple weeks prior, and he had never sold homes for Legend. He was put and partnered with at Legend's Trace with an experienced Legend's home seller. Dorman. Ms. Dorman. Yes, Your Honor. It is that transfer which is the basis of the gender discrimination claim in this case. Now, originally, Ms. Delaronde thought her transfer was temporary, but after one month, she learned that it was a permanent transfer. And after four months at that new subdivision, she quit. And she quit. Is there anything in the record? Excuse me for interrupting your dialogue. Is there anything in the record to indicate why she thought it was temporary? Yes, Your Honor. In understanding and reviewing the evidence and the like most favorable to her, it was that she was told that it was a temporary transfer. But the record shows a month later she had a conversation with the same manager who told her it was not temporary. So she knew after a month that transfer would not be temporary. And she stayed there for another three months. And in that other three months, she was provided a salary and she was able to obtain her commissions. And, in fact, for that year prior to the time she quit, she had made about $43,000. All right. But a lot of that was residual commissions from the first location. Yes, Your Honor. Yes, Your Honor. She was on a commission only. So the new assignment was less desirable in terms of the number of sales or the prices of the homes or whatever. It did not make available to her the sort of commissions that she had been used to. Is that fair to say? It's fair to say it's not the type of commissions she was used to when she left the other community. But the evidence does show when she first started at that community, Legends Trace, the one she didn't want to leave, that the sales were very slow. And it's Ms. Deleron's testimony that she was able to build up the sales in that community by making contacts, et cetera. So, basically, she was being put back in the same position to which she started. Well, let me ask you a question, though. What happened with Legends Trace evidently was that Exxon decided to move its campus out there, right? Yes, Your Honor. Legend didn't have anything to do with that, right? No, Legend didn't. But that's the circumstances of real estate, right? That was just serendipity. I assume that happened after Ms. Deleron started at Legends Trace, right? I believe that's the case, Your Honor, that it started after. But remember, Deer Brook Estates is only 12 miles from Legends Trace. Yes, but Deer Brook Estates is in Harris County. Right across 45, Your Honor. Right. So it's in Harris County, right across Highway 45. I suspect there are some differences in the neighborhood, you know, two of us here from Houston. Differences in the neighborhood and the quality of community services and that sort of thing. Your Honor, even if there were differences, it doesn't amount to a constructive discharge. And the houses are less expensive. Some of the houses, yes, there are. Matter of fact, there are two types of homes with Legend. It's very high-end homes, $600,000 and above, and lower homes, Legend homes that are usually $200,000 and below. Ms. Deleron was selling both types of homes in the prior subdivision and only the lower-end home in the second subdivision. But she was originally hired only to sell the lower-end homes, but number two, it still doesn't amount to a constructive discharge because, again, looking at the evidence and the light most favorable to her, the reason she said she had to quit is because she had only sold one home and that she was making $100,000 in commissions before and was down to $2,000 in salary and then was given zero salary. So that is her constructive discharge claims. However, that still, under the Fifth Circuit precedent, does not show constructive discharge, that her conditions were solely intolerable. Why don't you go back to the discrimination claim? Yes, Your Honor. Because obviously the jury wasn't too sympathetic to your position, so. With regard to it, well, Your Honor, you have both constructive discharge and the discrimination claim. They awarded punitive damages, so they were not very sympathetic. They were not very sympathetic, and with regard to the punitive damages, which the court found that there wasn't evidence to support those punitive damages, and we believe that there's not legally sufficient evidence to support the gender discrimination claim because the majority of the information that we see with regard to support that claim comes from two different areas, and one is through Ms. Delaron's subjective belief, but secondly, she was also not able to provide legally sufficient evidence that there were other males who were similarly situated to her in nearly identical circumstances that were treated more favorably. And, in fact, the court in its order noted that Ms. Delaron's circumstantial evidence that she relied on a listing of female and male placements and she elicited evidence that men were often placed in neighborhoods with higher value homes and that that was the evidence she relied on. The issue with that is that there's no evidence that these individuals were in nearly identical circumstances. In the brief and in the evidence that we see, Ms. Delaron, again, looking at the evidence, in the light most favorable to her, her best evidence is looking at women, that women were transferred more frequently, women were treated less favorably in placement and hiring communities, and women made less money. That is not the standard. The standard is to look as were men treated, similarly situated men treated more favorably. And in the evidence that we see here today, there's two men that she points to at trial. The first was Marvin Bullard, the man that went into her position at the other subdivision. And it is our contention that Marvin Bullard was not similarly situated in nearly identical circumstances because he did not have the same type of legend homes experience. And he had never sold one of the homes. He didn't know the price points. He didn't know the amenities. So how come they moved him directly right into a sales position very quickly? Well, just like with Ms. Delaron. Well, same with Ms. Delaron and same with her partner, Ms. Dorman. They're hired as a sales counselor. Not for two weeks, right? The training wasn't for two weeks. I'm sorry. I thought Mr. Bullard was hired, and then within two weeks he got transferred to Legends Trace. He was hired, and then he was hired, and he had actually sold homes before, just like Ms. Dorman and Ms. Delaron had sold homes for a competitor before. But what he didn't have is experience within the legend system and within the legend. I'm not answering my question. My question has to do with apparently he was only trained for two weeks, and then he was sent to Legends Trace. Is that right? He received training from a sales manager for a couple of weeks, and then he was placed in the subdivision. And it's the practice of legend that they put the sales associates in the subdivision then to receive further training, help, management, a helping hand, from the seasoned sales counselor within that subdivision. Did that answer your question, Your Honor? I guess so. So the classroom training is different from the on-hand assistance that's given at the subdivision. Ms. Delaron received that on-hand assistance from a man, Mr. Briggs, when she first started at the company, and then she provided that on-hand assistance to her new sales partner. And a lot of their case, according to their brief, turns on inconsistencies in the testimony of Mr. Briggs and Mr. The fellow's name starts with a T. I can't tell. Mr. Tulsa, yes, Your Honor. And it is our contention, Your Honor, that those are not inconsistencies, that in fact that what it is, those are not inconsistencies. Instead, they are just more levels of generality and more detailed reasons. And here's why. Again, looking at the evidence, most light and feral to her, she says that the testimony was that Mr. Briggs testified as affidavit that someone was needed to supervise and train LeQuin, that they needed to train two new sales counselors, then that someone needed to manage the Dearbrook Estates and help Ms. LeQuin because she was moved to that area. Well, I don't – I really don't understand how this – if they make zero money and they have a managerial or training capacity as well as their own sales responsibilities, that's pretty onerous in terms of working, isn't it? No, Your Honor, because it's not a true training role. Or they call it training, managing, temporary supervising, or giving them a helping hand. Well, whatever time is spent doing that is taken away from developing your market. Yes, Your Honor. And Mr. Briggs, a man, did that for Ms. Deleron when she first started employment. He was the sales counselor when she first started in her new subdivision at Legend. Both men and women do that at Legend. It's not a discriminatory practice. Let me just ask you, what is the status of Dearbrook, or by the time this lawsuit got underway, what was the status of the Dearbrook development? Yes, Your Honor, men sales counselors actually went in after Ms. Deleron and they sold all the homes and all the homes sold out. It was very successful. And she had that opportunity to do that and that she didn't. I think it's important with regard to the alleged shifting reasons to look at a couple of the Fifth Circuit cases, particularly the Hamilton case and the Minnis case because in those cases, there's the descriptions of different levels of generalities. For instance, in the Hamilton case, three reasons were given for termination, inaccuracy in listing apartments, inability to do the job, and lack of trust on the job. This court found in that case those are not inconsistent. They are just more levels of generalities. Same with the Minnis case, that more detailed reasons do not equate to shifting reasons. State those cases again. Yes. The Hamilton case, Your Honor, from 2014, actually Judge Smith was on that panel, and the Minnis case from 2015, M-I-N-N-I-S. And in both of those cases, it's important to show that they were multiple reasons. They're not different. In this case, managing, supervising, training, helping, they're synonymous with the same kind of conduct that occurred. So why do you speculate the jury found this case so appealing? Because they saw that women were being moved, and Ms. Delaron's testimony of her belief that the reason that her thought that women were moved around more than men, and as Judge Bennett correctly pointed out, that when you have more women than necessarily they may be moved around more, and just the fact that someone is shifted in another position, that that subjective belief is really not enough. There needs to be more. And that is why we have the similarly situated, because the plaintiff bears the burden to show more than just people are being moved,  Thank you, Your Honor. Do we have time for rebuttal? Yes, Your Honor. Thank you. Ms. Hanson? Were you the trial counsel? I was, Your Honor. May it please the Court? My name is Jackie Hanson. I represent appellee Arlene Delaron. Obviously, this is an appeal of a denial of a judgment as a matter of law and for a motion for new trial, which this Court will review de novo, giving, of course, due deference to the jury's decision. And so I want to talk about the basis for the jury's decision. I will, if I may, refer the Court to our brief for the factual recitation. I don't want to take up the time with that to the extent I don't need to. But I would like to move on to the facts as they are relevant to our arguments in this case. So to determine whether or not judgment as a matter of law should have been granted in this case, we have to determine the basis for the jury's findings in this matter. As the Court mentioned, the jury was unpersuaded by defendant's defense in this case for multiple reasons. We had both the credibility issues that cast doubt on the reasons the defendant was giving for the transfer, and we also had empirical evidence that indicated that females truly were transferred more frequently than males, that females were placed in properties that offered lower earning potential than males, and that women were actually moved out of positions to make room for males when new males came in or males were ready to be moved up in the system. I'll start by talking about whether or not these males were comparators. These people all had the exact same job description. There are only two of those, right, Savoy and Bullard, right? That's correct, Your Honor. With respect to all of the sales counselors, however, we look at Bullard and we look at Ms. Dellerand, and their offer letters are there for us to view, and the offer letters are identical with one exception. Brett Briggs is listed as the supervisor on Marvin Bullard's because he was promoted from the property that he had worked with Dellerand. That being the only difference, their job duties, job responsibilities, their pay rate, which was 2% commission, everything was exactly identical. All of the evidence indicated that Ms. Dellerand was moved from that location and replaced with someone else. Now, we know that defendant's argument in this case is that because Ms. Dellerand was more senior, and evidently the argument includes because she was more capable to some degree, that she cannot be a comparator to someone who has replaced her. This leads to an illogical result, obviously, because any time we have a situation in which a more senior and very capable employee is ousted to make room for some new hire who is outside of the class, that argument would be defeated if this was the logic that we followed. Similarly, in failure to promote cases, if we had, for example, a female manager who was seeking a position as a VP, and we had a male janitor, both of whom had fantastic work histories and well-respected employees, but had different capabilities, if the male janitor was promoted over the female manager to this position, she would have no claim for discrimination. This is an illogical argument. Mr. Bullard went to Legends Chase at a time when it had almost been sold out, right? It had another year, and it had its highest selling year to go. It was increasing. In 2012, for example, it reached sales of $13 million. It sold out at the end of 2000. I'm going to back up. I'm sorry. In 2012, it had sales of $13 million, and then it closed out at the end of 2013. I would like to address, if I may, the question with regard to the fate of Dearbrook after Ms. Dellerand left. There's nothing in the record that indicates the rosy future that lay ahead of it as indicated by appellant's counsel. Instead, the information we have is two more women went to that location, both quit from that location. Marvin Bullard was then transferred to that location after the EEOC claim was filed,  Is there anything in the record to tell us anything about the average or median sales prices in the two subdivisions that are at issue? Yes. Defendant's Exhibit No. 22, and I apologize, I don't have the record on appeal page number, but Defendant's Exhibit 22 was used extensively as an exhibit, and it does list the home sales prices on there. If you compare those to the graph that's in appellant's brief that sets forth some of the moves that were discussed in Mr. Briggs' testimony, you can compare those home prices when comparing the salespeople who were moved to and from those locations, and Dearbrook is included on there. What I really meant by my question was tell us, in summary, what the differences were, if there were any. The Dearbrook Estates property was $100,000 to $120,000 homes, and it was only the Lower End Legends property. The Legends Trace property had both Legends and the Princeton homes, and the prices went upwards of $300,000 for the Princeton homes. Ms. Delleron testified that she and Ms. Dorman were both selling both properties. They would switch off commissions, and so they split their commissions and the work. If we look at the numbers, the volume sales in 2012, again, we had $13 million for Legends Trace. We had $3 million for Dearbrook. Both were split by two people, and so if we look at the income at a 2% commission pre-tax, we're looking at a difference of, I believe, $120,000, $130,000 to $60,000 to be split. I'm sorry, $260,000 to $60,000 to be split between two people. Well, you can't, I mean, you know, figures don't tell the whole story. You don't, just because you sell homes for the company doesn't mean you have a right to sell at the most affluent developments, correct? Absolutely. And everybody at the company knew that, right? That's correct, Your Honor. There was testimony, however, that the company did not like to move people unless it, as long as they were doing well in those communities. Dorman testified that she was shocked by the move and disgusted by the move of Ms. Dellerand. Ms. Dellerand was surprised by that. I mean, I don't understand how you can be disgusted because they moved someone just because she broke up, they broke up a successful team, is that what you're saying? Actually, I've conflated two issues, and this does lead me to move on to the next one. The disgust was indicated by, was in reaction to her statement that they had both been lied to. So we talked about Ms. Dellerand being willing to move to the new location, to Deer Brook Estates, to train. And she testifies that she wanted to be a team player. She did not mind going temporarily to train. However, she was induced into moving based on a lie. Both Ms. Dellerand and Ms. Dorman testified that at that time that was their understanding. But their brief says that Dorman learned about this only from Dellerand. Dellerand, in impeaching Dellerand at Dorman, excuse me, she had to admit on the stand that she sent a text to Dorman, to Dellerand, stating we were both lied to, we were told it was temporary, and then a subsequent that she was disgusted. So after the fact, she did try to say that, oh, I was only going along with it. But contemporaneously with the event, when confronted with the text that she had sent to Dellerand, it tells a different story. That's not my point. My point is that her information about whether it was temporary came only from the plaintiff. Yes, and also on impeachment. Through the text, she did state we were both lied to, which would indicate a direct lie to her. You had plenty of opportunity to clarify on the witness stand. And we did talk about that on the stand. It's in the record, Your Honor. Ms. Steele told us that Dearbrook was successful after Ms. Dellerand left. Would you help us with the record on what, I mean, give us a fair representation of what the record says about that? Yes, Your Honor. The testimony that we have regarding the post-Dellerand, Dearbrook situation is that Tasha LeQuinn continued to work there and ultimately left from that property. She quit. She was no longer working for Legends. I believe also there was another female named Maria Morua who also left from the property. And subsequent to that, we know that Marvin Bullard was placed in that property, I believe, in January of 2014, and then he quit the home sales business from there as well. I don't believe the record contains any other information regarding Dearbrook's fate. There was some testimony regarding a man named Mauricio, and I do not remember his last name, that came out either through questions from appellants' counsel or through Briggs, but there's nothing in the record beyond a mention that he was at that property. Tollesford did say that there were no females at that property during 2012 or 2013. So are you saying that, so again, I mean, Ms. Steele, I wrote down what she said. She said Dearbrook was successful after Ms. Dellerand left, and you're saying that there is nothing in the record to give any picture of overall success or lack of success in the sales picture at Dearbrook? I believe given the associates who left the property in the subsequent seven months that there's an indicator of lack of success, but I cannot speak to that beyond that inference from the record. And if I may now move on. So speaking with that property, we do have documentation. Again, Tollesford said that no women were moved to that property during 2012 and 2013. Mr. Tollesford, who has co-responsibility for transfers, they testified that five women had been moved in and had left from that property. One of the reasons for transferring was that a woman was being harassed. This was one of the things that had perhaps a bearing on Briggs's credibility. And I'd like to move to – Why was Mr. Briggs an important witness for legend here? Briggs was one of the two decision makers, and Briggs was the person who prepared an affidavit in support, and the affidavit was admitted into evidence, and he had initial decision making that was concurrent and could be vetoed by Tollesford. So it was essentially 50-50, but Briggs was kind of the boots on the ground. So appellant's counsel in her argument kind of mirrors what happens in the briefs, and we have all these differences in positions. For example, we have a sales assistant turning into assistant sales counselor. We have a sales counselor becoming senior sales counselor or a managing sales counselor. None of these positions are represented anywhere else in the organization or anywhere else in the records, but they are all attempts to get around the issue of training. Now, we can only surmise that the reason that training was such a hot button for defendant is because of the allegation that women were disproportionately assigned to train. And the evidence elicited at trial definitely showed that, that seven of the ten people assigned to train were women. Of course, three were men. Brett Briggs is included in that, but he's a manager, does not sell homes, and training is one of his responsibilities. I want to go over as quickly as I can some of the inconsistencies with record sites so that you can check them as well. I tried to talk to Mr. Briggs about training on the stand, and I asked, is it part of Ms. Deleron's duties to train her? Is that right? And the answer was, it was part of it, yes. Fifteen pages later, after we had some back and forth, was Ms. Deleron going to have to train Ms. LeQuinn or not when she moved over to Dearbrook Estates? LeQuinn had already been through training, several training experiences with a previous sales counselor. Not only them, but my training that she'd gone through, there was no formal training outline that Ms. Deleron would have to follow or anything of that nature. And that's the record 1506-1507. Then I refreshed the witness's memory with Exhibit 6 in which he says we needed them to train. 1509, I'm trying to get to the bottom of this. Training is one of the primary reasons they said that they moved Ms. Deleron over and over again in their pretrial documents. We get these witnesses on the stand, and the story changes. So if their core reason for transferring her is not to be believed, then a jury, based on the jury instructions, may then infer discrimination. So I'm trying to get to the bottom of this. So was Ms. Deleron moved to Dearbrook Estates to train or not? And this is at 1509, same page. No. Well, let me hold it a second. Part of the expectation was that she'd be there and readily available to work with Ms. LeQuinn. She was not moved there to train. She was moved there to manage that community, 1509-1510. Plaintiff's Exhibit 6, which is record page 2041, says that Legend had two new counselors that needed to be trained. Those were Bullard and LeQuinn. So again and again we have these issues. And finally, we have Plaintiff's Exhibit 24, which is Mr. Briggs' statement in which he says, because of LeQuinn's lack of experience, Legend sought to have another more experienced employee supervise and train Ms. LeQuinn. So he contradicted his own prior statement and he contradicted himself repeatedly on the stand. He also contradicted his own manager, Tollisford. Well, you know what? I mean this case boils down to complete circumstantiality and I can certainly see why it would have defeated summary judgment, but I have a real hard time seeing where you went the extra mile to say that to actually prove that whatever happened to Ms. Deleron was because she was a woman. Well, if you look at the jury charge, Your Honor, and I'm going to be watching. Because all you have is these inconsistencies about training, but it's obvious if you're the senior person in a two-person office, you're going to be advising the less senior person. No, Your Honor, even more so than the training. I apologize, but our argument actually is that it was the removal, it was the transfer from Legends Trace for whatever reason. We don't believe that it was actually primarily for training, obviously. We believe she was moved to make room for Marvin Bullard, who had been hired and was ready for placement that day. So training is not our primary argument here. The fact that they're saying it was training, when a lot of evidence indicates perhaps it was, perhaps it wasn't, gets us to the fact that this is not a legitimate reason for transfer, that they had something else that they cannot articulate or are not willing to articulate. That gets us to the jury charge where it says that she may prove discrimination by proving that she was removed from her position and replaced by someone similarly qualified. Now, we know that the jury focused on that. This gets me to the jury charge issue, which the instruction request, and I apologize for jumping. I want to make sure I hit all the things. The judge didn't give any instruction about similarly situated. He gave the standard instruction that's contained within the Fifth Circuit pattern jury charge. Appellant was asking for a very long paragraph that included case citations and included nearly identical language. That's not part of any pattern jury charge. There's no case law that supports the inclusion. In fact, it included many cases, almost all of which had issues of discipline or attendance problems, other reasons for the termination. But most importantly, first of all, so it was not error, the judge used his discretion to determine that the pattern jury charge applied to the instant circumstances in this case and that the requested instruction would not be instructive. This charge, when viewed as a whole, fully served its purpose and did not mislead the jury. But if we look at the jury question that appellant pointed us to, that is a question regarding similarly qualified, which is a different phrase from similarly situated. The instruction states that they can find that she was replaced by someone similarly qualified or, in the disjunctive, that she was treated differently from similarly situated people outside her class. So if the instruction had been given, it would not have gone to the similarly qualified, which was obviously what the jury was focusing on. Let me ask you a question. You know, we have a lot of law that says that just changes in salary do not provoke constructive discharge. And suppose we hold that this part of the verdict was not consistent with the law. Then what would we do? Well, first of all, Your Honor, we did not bring constructive discharge as a separate claim. In our readings of the law, it is merely another way to prove adverse employment action. And as is stated in the jury charge, the actual adverse employment action was the transfer itself. But the jury got two separate questions, didn't it? They did, yes. And so they also found for the constructive discharge, if the court found that constructive discharge did not exist in this case, the jury still found that the transfer was a discriminatory act, and the transfer was what resulted in the deprivation of income. Well, I understand that. Well, I mean, that's my question, of course. What do you do about the damages in a circumstance like that? Essentially, we consider this as two independent adverse actions. One was pled in the alternative. The transfer itself, and if you read the jury charge, it said did they discriminate in transferring her. It does not say did they discriminate in constructively discharging her. While it may have implications on damages, that was not pled and that was not preserved by appellant. Thank you, Your Honors. I'm just following up on what Judge Jones asked you, which is if we should decide that there was inadequate evidence, as a matter of law, on constructive discharge, but that there was sufficient evidence on sex discrimination, are you saying that it should not then be remanded for a new trial on damages? That is what I'm saying, Your Honor, and for two reasons. The first, all of the testimony stated that Ms. Deleron did give it her sincere efforts. Even Brett Briggs admitted that she was trying very diligently in Dearbrook Estates. The evidence that we have indicates that two women after her and a man were unable to make a living at that location, and they left that location as well. So the results would have been the same regardless of whether she quit or she stayed and continued to make no money whatsoever. And the second is appellant has not raised any issue with regard to damages or to this at all, in fact. And so because they have not preserved the issue, it's not right for the court to review. Did I hear this correctly, that Legend is a, quote, woman-owned business? Not. The person that I'm aware of is a male president. Okay. I was wondering. Thank you. All right. Thank you. Ms. Steele? Your Honor, I'd briefly like to address a couple of issues that were brought up during argument. First, yes. Let me get back to the questions that I was asking Ms. Hanen and get back to your statement that Dearbrook was successful after Mr. Delaron left, and Ms. Hanen was indicating that she didn't know of anything in the record that indicated overall success or lack of success at Dearbrook after Ms. Delaron left. What is in the record to support the statement that you gave us about that? My understanding is that is in the record and that the history of what happened after Ms. Delaron left Dearbrook Estates is in the record, going from the people that replaced her to the fact that Mr. Bullard left, remained with the company in a construction role, to the fact that the community was eventually closed out. I do not have a record site. All right. But you're telling us as an officer of the court that we're going to find that in the record, that Dearbrook was overall successful after Ms. Delaron left. Your Honor, I'm telling you, I know that that's the circumstance, and I don't know that that's necessarily in the record or not. I just don't know. I know that's the circumstance. I know there's testimony on it throughout the court. You shouldn't have made that statement to us without indicating that it wasn't in the record because that's misleading. Now what about the women owned? Is that in the record? I believe it is through the introduction of our corporate representative who is the owner of the company who was sitting with us at trial. Okay. That that person indicated that the company is majority owned by women or what? I know in my argument that I introduced her as one of the owners of the company and as our corporate representative. She did not testify in trial at that time. We had other individuals that testified in trial. So it's misleading for you to tell us it's women owned. We don't know that from the record. She stated it in open court. I did state it in open court, Your Honor. And whether or not one of the witnesses testified or acknowledged that she was, I did announce that in open court, Your Honor. Okay. And you also indicated to us that these two, I'll call them neighborhoods or subdivisions, were nearby? Yes, Your Honor. The record shows 12 miles away. All right. But 12 miles is not nearby in Harris County. How can you tell us that that was nearby? Because Mr. Briggs, who was originally working in Legends Trace, was transferred 45 miles away to Katie originally when he left Miss Delaron. So as far as the transfer goes within the Houston area for Legends Homes, a 12-mile transfer was considered closer than another transfer. For instance, Miss Delaron. Well, but as an absolute matter, 12 miles in Harris County is not nearby. I mean, I'm thinking of a map of Houston, for example. If you travel as the crow flies from the north loop to the south loop, that would be about 12 miles. Those are not nearby neighborhoods. There's all kinds of differences in between. And the same would be true of North Harris County. Twelve miles is a long way. It probably takes 30 or 40 minutes to go 12 miles. Your Honor, with regard to where Legend had home communities, that was one of the nearest home communities. That's the nearby with regard to where Legend home communities are. With regard to a couple of the issues that we had in this case, number one, with regard to the constructive discharge, the plaintiff has failed to present a single case since that shows that constructive discharge in a transfer and reduced compensation type of event would amount to a constructive discharge. And the very cases she cites show that constructive discharge was not upheld. Additionally, with regard to the similarly situated... To follow up on the question that we were asking her about the damages. All right. If we should decide, I'm not saying that we will or we won't, if we should decide that there's inadequate evidence as to constructive discharge but that there's at least sufficient evidence and more than sufficient evidence on sex discrimination, then what should be the result in terms of whether it should be remanded for a new trial on damages or what should happen? Again, assuming, I know you wouldn't care for that result, but assuming that that's the result, what should be done? Your Honor, constructive discharge is another means in order to prove discrimination, and I don't believe that the remand is appropriate in that scenario. You don't believe that the remand is... Proper in that scenario. Proper, okay. That's right. And briefly, with regard to the harmful error and the jury charge issue, the pattern jury charge was not followed specifically and there is no definition for substantially situated within the jury charge that was given to the jury. The jury's note said, could we have more clarification? And they could have had more clarification if that instruction would have been submitted to the jury. For these reasons, Your Honor, did we ask... Did you have another question? I'm sorry. Okay. Thank you for your time today. Have a good day. All right. Thank you very much. Court will stand in recess.